**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:19-cr-179 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| DAVION C. WINDSTON-STROUD, | : | |
| | : | |
| Defendant. | : | |
| | : | |

---

**ENTRY AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS
(DOC. 14)**

---

This case is before the Court on the Motion to Suppress (Doc. 14) (the "Motion") filed by Defendant Davion C. Windston-Stroud ("Windston-Stroud"). Windston-Stroud seeks an order "suppressing all evidence seized, resulting from law enforcement's [alleged] unlawful seizure and search of his person, the three vehicles associated with his charges and the residence in which he was residing." (Doc. 23 at PAGEID # 270.) The Court held evidentiary hearings for the Motion on January 28, 2020 and February 24, 2020. (Docs. 20 and 21.) Windston-Stroud filed a post-hearing brief in support of the Motion (Doc. 23), the Government filed a post-hearing brief in opposition (Doc. 27), and Windston-Stroud filed a reply brief in support of his Motion (Doc. 28). The matter is ripe for review. For the reasons discussed below, the Court **DENIES** the Motion.

**I.  FACTUAL FINDINGS**

The following findings are made based on the evidence submitted by the parties and the testimony at the January 28, 2020 and February 24, 2020 hearings. The charges in the indictment stem from two separate incidents involving a vehicle operated by Windston-Stroud: (1) a traffic

1

stop for illegally tinted windows on September 17, 2019, and (2) a traffic stop for illegally tinted windows on November 18, 2019.

### A. September 17, 2019

On September 17, 2019, Dayton Police Department ("DPD") officers observed a Kia Optima (the "Kia Optima") with illegal window tint. One of the officers ran the Kia Optima's plates, which indicated that it was a rental car.

Sergeant Ryan Halburnt ("Sgt. Halburnt"), an officer with the DPD since 2001, initiated a traffic stop of the vehicle. Sgt. Halburnt testified that, based on his experience in ticketing vehicles for illegal window tint hundreds of times before, he knew that the window tint on the Kia Optima was over the legal limit. Because its windows were so dark, as he approached the driver's side of the vehicle, he called out for the driver to roll down the window so that he could see inside. As soon as the occupants rolled down the windows, Sgt. Halburnt could smell a strong odor of raw marijuana coming from the vehicle.[1] He also could see that there was a person in the front driver's seat (who turned out to be Windston-Stroud) and another person in the passenger seat. Both occupants appeared to Sgt. Halburnt to be nervous when he started talking to them.

Sgt. Halburnt asked Windston-Stroud to step out of the vehicle. Windston-Stroud complied. Sgt. Halburnt asked Windston-Stroud if he (Sgt. Halburnt) could pat him down for weapons. Windston-Stroud said yes. Sgt. Halburnt then conducted a pat-down of Windston-Stroud, who did not object nor withdraw his consent. During the pat-down, Sgt. Halburnt felt a bulge, which he recognized from experience to be narcotics.

Sgt. Halburnt then placed Windston-Stroud in handcuffs, recovered the narcotics he had found on Windston-Stroud, and placed Windston-Stroud in the back of his police cruiser. Shortly

---

[1] Another DPD officer testified that, as he approached the passenger side of the Kia Optima, he likewise could smell a strong odor of marijuana coming from the vehicle.

2

thereafter, Windston-Stroud complained that his handcuffs were tight, so Sgt. Halburnt adjusted the handcuffs. In doing so, Sgt. Halburnt noticed another bulge in one of Windston-Stroud's pockets, which turned out to be additional narcotics.

Following the arrest of Windston-Stroud and the other passenger, the Kia Optima was towed. It is DPD's policy to inventory and search such a vehicle before it is towed.

### B. November 18, 2019

On November 18, 2019, DPD officers Jordan Alexander ("Officer Alexander") and Stephen Lloyd ("Officer Lloyd") observed a Hyundai Sonata (the "Hyundai Sonata") with illegal window tint. The officers conducted a traffic stop of the vehicle, which was being driven by Windston-Stroud and had a passenger in the front passenger's seat. The officers decided to call a K-9 officer to the scene due to the occupants' drug and gun history. DPD Detective Jeremy Stewart ("Detective Stewart") and his K-9 officer Weston arrived on the scene and conducted an open-air sniff of the vehicle.[2] K-9 officer Weston alerted to an odor of narcotics near the seam between the Hyundai Sonata's front and rear passenger doors. However, following a search, no narcotics were found in the vehicle. Officer Alexander was still in the process of completing the traffic citation for the window tint violation at the time K-9 officer Weston alerted. Approximately 12 to 13 minutes had elapsed between the time that the officers initiated the traffic stop and the dog sniff.

During the traffic stop, parole officers for the State of Ohio drove by the scene. The parole officers included Jordan Lear ("Parole Officer Lear"). They stopped and decided to check if any of the Hyundai Sonata's passengers were on parole. They learned that Windston-Stroud was on active supervision at the time, which they confirmed through their supervisor. (Windston-Stroud concedes that he was under Post-Release Control and was a parolee at the time of the incident.)

---

[2] At the time of the incident, both K-9 officer Weston and Officer Stewart had undergone K-9 training, and K-9 officer Weston was a certified drug canine.

3

The State of Ohio Department of Rehabilitation and Correction Adult Parole Authority's Conditions of Supervision for Windston-Stroud (the "Conditions of Supervision") states the following:

> In consideration of having been granted supervision on 2/12/18 …
>
> 1. I will obey federal, state and local laws and ordinances, including those related to illegal drug use and registration with authorities. I will have no contact with the victim of my current offense(s).
>
> 2. I will follow all orders given to me by my supervising officer or other authorized representatives of the Court or the Department of Rehabilitation and Correction, including, but not limited to obtaining permission from my supervising officer before changing my residence and submitting to drug testing.
> …
>
> 4. I will not purchase, possess, own, use or have under my control, any firearms, ammunition, dangerous ordnance, devices used to immobilize or deadly weapons, or any device that fires or launches a projectile of any kind.
> …
>
> 7. I agree to the warrantless search of my person, motor vehicle, place of residence, personal property, or property that I have been given permission to use, by my supervising officer or other authorized personnel of the Ohio Department of Rehabilitation and Correction at any time.
> …

(Government Exhibit 10.[3])

Upon questioning, Windston-Stroud stated that his address was 39 East Norman Avenue in Dayton, Ohio. However, that was not the registered parole address on file for him. Windston-Stroud admitted to the parole officers that he had failed to inform his supervising parole officer of the 39 East Norman Avenue address where he was residing. (Windston-Stroud concedes that, therefore, he was in violation of condition number 2 of his Conditions of Supervision.)

The parole officers decided to go to the 39 East Norman Avenue address. Windston-Stroud

---

[3] Windston-Stroud's brief acknowledges that he signed the document on February 13, 2018. (Doc. 23 at PAGEID # 278.)

4

provided officers with keys to the house at that location, as well as his car keys. At the request of the parole officers, DPD officers transported Windston-Stroud to that address and remained present to assist the parole officers and for their safety.

Parole Officer Lear testified that it was his decision to search the house at 39 East Norman Avenue. Once at the house, he came into contact with Jasmine Leroy ("Ms. Leroy"), Windston-Stroud's girlfriend and the mother of their children. Parole officers searched the house and found, among other things, a state identification card belonging to Windston-Stroud, an Ohio government card belonging to Windston-Stroud, a risk assessment paper belonging to Windston-Stroud, a utility bill with Windston-Stroud's name on it, a certificate of title to a 2009 Chevrolet vehicle with Windston-Stroud's name on it, a large hydraulic shop press in the basement, and a magazine (with ammunition inside of it) for a firearm.

Parked at 39 East Norman Avenue was a silver Chrysler vehicle (the "Silver Chrysler"). Using the keys provided by Windston-Stroud to open it, parole officers searched that vehicle. Inside, behind the front passenger seat, officers found a firearm. Parole officers then arrested Windston-Stroud for a parole violation.

### C. **Indictment and Arraignment**

On December 3, 2019, the Grand Jury returned a two-count indictment against Windston-Stroud. (Doc. 11.) The counts charge Windston-Stroud with (1) knowingly and intentionally conspiring with intent to distribute fentanyl, methamphetamine, and cocaine in violation of 18 U.S.C. § 846, and (2) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (*Id.*) On December 5, 2019, Windston-Stroud appeared for arraignment on the indictment and entered a plea of not guilty to both counts. (12/05/2019 Minute Entry.)

## II.     ANALYSIS

The Fourth Amendment states:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  Thus, its text expressly imposes two requirements. *Kentucky v. King*, 563 U.S. 452, 459, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011).  "First, all searches and seizures must be reasonable." *Id.*  "Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Id.*

A search conducted without a warrant issued upon probable cause is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions.  *United States v. Doxey*, 833 F.3d 692, 703 (6th Cir. 2016).  "The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search."  *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (*citing Wong Sun v. United States*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).

A criminal defendant may seek the suppression of evidence by filing a pretrial motion with the Court.  FED. R. CRIM. P. 12(b)(3)(C).  "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003); *U.S. v. Blakeney*, 942 F.2d 1001, 2015 (6th Cir. 1991) (in the context of a motion to suppress, the moving party has the burden of establishing that the evidence was secured by an unlawful search).

6

However, "[t]he Government has the burden of proof to justify a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002).

Here, Windston-Stroud's overarching argument is that the officers "did not have any valid basis for seizing and searching Mr. Stroud, the vehicles and the residence" and, therefore, "any evidence obtained from those unlawful searches were made as 'fruit of the poisonous tree.'" (Doc. 23 at PAGEID # 271 (citing *Wong Sun*, 371 U.S. at 486).) Windston-Stroud does not challenge either vehicle stop for excessive window tint. (*Id.* at PAGEID # 273, 279.)

### A. September 17, 2019 – Removal from Vehicle, Pat-Down, and Vehicle Search

Windston-Stroud first challenges whether the officers had sufficient probable cause to have him step out of the Kia Optima on September 17, 2019 and subject him to a pat-down search. (Doc. 23 at PAGEID # 273.) According to Windston-Stroud, the reason Sgt. Halburnt asked him to step out of the vehicle was an unlawful pretext to simply conduct a further investigation following a minor misdemeanor infraction for illegal window tint. In support, he says that the marijuana retrieved from his pocket was in a clear plastic bag and unsmoked (and that there is no indication that marijuana was smoked in the Kia Optima), so the marijuana would not be capable of producing a pungent scent.

"[D]uring a traffic stop, an officer may order passengers out of the vehicle pending the completion of the stop." *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (citing *Maryland v. Wilson*, 519 U.S. 408, 414-15, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997)); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) ("once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures"). "The officers do not need independent justification to remove the driver or passengers from the vehicle." *Pacheco*, 841 F.3d at 390. Therefore, the

7

Court finds that, after permissibly stopping the Kia Optima for an illegal window tint violation, Sgt. Halburnt was permitted to remove Windston-Stroud from the vehicle.

Regarding the pat-down, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L.Ed. 2d 854 (1973); *see also United States v. Fisher*, 27 F. App'x 558, 560 (6th Cir. 2001) (affirming district court's denial of defendant's motion to suppress where detectives testified that the defendant said "o.k." to a request for permission to search her person). "[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he [or she] has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth*, 412 U.S. at 219 (internal quotation marks omitted).

The evidence presented shows that Windston-Stroud consented both to exiting the vehicle and to the pat-down. (Doc. 20 at PAGEID # 84-86.) Windston-Stroud does not argue otherwise. This includes that Windston-Stroud does not counter the Government's evidence that his consent to the pat-down was freely and voluntarily given. In fact, Windston-Stroud concedes that Sgt. Halburnt "asked [him] if he could pat him down for weapons, to which [he] consented." (Doc. 23 at PAGEID # 272.) The Court finds that the pat-down was permissible. *Schneckloth*, 412 U.S. at 219 (when valid consent to a search is provided, neither a warrant nor probable cause is required to conduct the search).

Windston-Stroud also argues that there was a lack of probable cause to search the Kia Optima on September 17, 2019. (Doc. 28 at PAGEID # 335-36.) According to Windston-Stroud, the officers' allegation that there was a strong odor of marijuana "was a pretext for the search of the vehicle." (*Id.*) The Government counters with several arguments, one of which is that the search was a valid inventory search, conducted pursuant to DPD policy.

8

"Inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013). "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Id.* "It is settled law that the police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment." *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012); *see also United States v. Hughes*, 420 F. App'x 533, 540-41 (6th Cir. 2011) (an inventory search is properly held to be lawful when a defendant fails to demonstrate that the officers impounded and inventoried the car in bad faith or for the sole purpose of investigation).

The Court finds that the search of the Kia Optima did not run afoul of the Fourth Amendment. Sgt. Halburnt testified that, following the arrest of Windston-Stroud and the only other passenger, the Kia Optima was towed and that it is DPD's policy to inventory and search such a vehicle before it is towed. (Doc. 20 at PAGEID # 90.) Windston-Stroud does not argue otherwise and does not attempt to counter the Government's argument or evidence that the vehicle was searched pursuant to a valid inventory search.[4] *Jackson*, 682 F.3d at 455; *Hughes*, F. App'x at 540-41; *United States v. Pryor*, 174 F. App'x 317, 320 ("[t]he district court correctly determined that the police did not need probable cause to search [defendant's] car, because the search was an inventory search incident to impoundment, and the vehicle was impounded pursuant to the … Police Department's Tow-In Policy"). Therefore, the Court denies the Motion with respect to evidence seized during, or in connection with, the September 17, 2019 searches at issue.

---

[4] Thus, the Court does not reach the Government's other arguments in support of the search of the Kia Optima, including that the search was supported by probable cause due to the suspected narcotics found on Windston-Stroud and due to the strong odor of marijuana detected by the officers as they approached the vehicle. (*See* Doc. 27 at PAGEID # 325-26.)

9

### B. **November 18, 2019 – Dog Sniff**

Windston-Stroud next challenges whether officers had sufficient "probable cause to have a K-9 Officer conduct an open-air sniff" of the Hyundai Sonata on November 18, 2019. (Doc. 23 at PAGEID # 277.)

"It is well-established that a canine sniff is not a search within the meaning of the Fourth Amendment." *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012) (internal quotation marks omitted). And, "a dog sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)). However, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350. In other words, while an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. "A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 350-51 (internal quotation marks omitted).

"Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. The Supreme Court discussed what may be necessary to "complete the mission of issuing a warning ticket":

> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

10

*Id*. at 355 (internal citations and quotation marks omitted). Additionally, certain tasks related to officer safety may stem from the officer's traffic mission (such as requiring a driver, who is lawfully stopped, to exit the vehicle). *Id*. at 356-57. However, conducting a dog sniff is not properly characterized as part of the officer's traffic mission. *Id.* at 356.

Based on the evidence presented, the Court cannot find that the dog sniff prolonged the seizure "beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350-51. Windston-Stroud does not offer evidence to counter this or argue otherwise. Instead, Windston-Stroud argues that "the canine team must lawfully be present at the location where the sniff occurs." (Doc. 23 at PAGEID # 280 (citing *United States v. Reed*, 141 F.3d 644, 650 (6th Cir. 1998)).) However, he fails to explain how the roadway where the sniff occurred was an unlawful location for the K-9 officer and his handler to be present, and the Court does not find it to be so. *See Reed*, 141 F.3d at 650 (canine team was lawfully present in defendant's residence either due to the pursuit of a burglar or defendant's consent); *see also United States v. Diaz*, 25 F.3d 392, 396-97 (6th Cir. 1994) (canine team was lawfully present in portion of parking lot reserved for motel guests that officers could enter; contrasting a case where government agents had unlawfully entered into an apartment building).

### C. November 18, 2019 – Entry and Search of Residence and of Vehicle Parked at Residence

Windston-Stroud next challenges whether officers violated his, Ms. Leroy's, and their children's Fourth Amendment rights by entering and searching the residence at 39 East Norman Avenue without a warrant. (Doc. 23 at PAGEID # 277-78.) Windston-Stroud argues that he has standing to contest the warrantless search and that the fact the K-9 officer hit on currency found on him is insufficient to permit a warrantless search of the residence. (*Id.* at PAGEID # 281-82.) He also challenges the search of the Silver Chrysler, arguing that officers needed a warrant to

11

search the vehicle because it "was parked on private property, part of the curtilage of 39 E. Norman Ave." (Doc. 23 at PAGEID # 284 (citing *Collins v. Virginia*, 138 S. Ct. 1663 (2018).)

As an initial matter, Windston-Stroud cannot assert the Fourth Amendment rights of Ms. Leroy and their children. *United States v. Noble*, 762 F.3d 509, 526 (6th Cir. 2014) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted"); *United States v. Jackson*, No. CR 17-50-DLB-CJS, 2018 U.S. Dist. LEXIS 69526, at * 6-7, 2018 WL 1952520 (E.D. Ky. Apr. 25, 2018) (whether the officer "may have violated other individuals' Fourth Amendment rights is of no consequence in this matter because it would neither provide a defense nor warrant suppression of the evidence in the Defendant's case").

Another recognized exception to the general rule that a warrant be secured prior to a search is for searches conducted "pursuant to a constitutional state law authorizing the warrantless searches of parolees and their residences." *United States v. Sweeney*, 891 F.3d 232, 235 (6th Cir. 2018) (internal quotation marks omitted).[5] Courts conduct a two-prong inquiry in such an instance. *United States v. Loney*, 331 F.3d 516, 520 (6th Cir. 2003). "First, courts examine whether the relevant regulation or statute pursuant to which the search was conducted satisfies the reasonableness requirement." *Id.* "If so, courts then analyze whether the facts of the search itself satisfy the regulation or statute at issue." *Id.*

---

[5] *See also Griffin v. Wisconsin*, 483 U.S. 868, 873-74, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987) ("A State's operation on a probation system … presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements") (internal quotation marks omitted); *Samson v. California*, 547 U.S. 843, 852-53, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006) ("a State has an overwhelming interest in supervising parolees because parolees … are more likely to commit future criminal offenses," "a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment," and "acceptance of a clear and unambiguous search condition significantly diminishe[s] [a parolee's] reasonable expectation of privacy") (internal quotation marks omitted).

The constitutional state law purported to authorize the warrantless search here is Ohio Revised Code ("O.R.C.") § 2967.131(C).[6] (*See* Doc. 27 at PAGEID # 329-30.) That statute states, in part:

> During the period of a conditional pardon or parole, of transitional control, or of another form of authorized release from confinement in a state correctional institution that is granted to an individual and that involves the placement of the individual under the supervision of the adult parole authority, and during a period of post-release control of a felon imposed under section 2967.28 of the Revised Code, authorized field officers of the authority who are engaged within the scope of their supervisory duties or responsibilities may search, with or without a warrant, the person of the individual or felon, the place of residence of the individual or felon, and a motor vehicle, another item of tangible or intangible personal property, or other real property in which the individual or felon has a right, title, or interest or for which the individual or felon has the express or implied permission of a person with a right, title, or interest to use, occupy, or possess, if the field officers have reasonable grounds to believe that the individual or felon has left the state, is not abiding by the law, or otherwise is not complying with the terms and conditions of the individual's or felon's conditional pardon, parole, transitional control, other form of authorized release, or post-release control.

O.R.C. § 2967.131(C). In line with the statute, Windston-Stroud's Conditions of Supervision states: "7. I agree to the warrantless search of my person, motor vehicle, place of residence, personal property, or property that I have been given permission to use, by my supervising officer or other authorized personnel of the Ohio Department of Rehabilitation and Correction at any time." (Government Exhibit 10.)

The Sixth Circuit has held that O.R.C. § 2967.131(C), with its "reasonable grounds" standard, "passes constitutional muster." *Loney*, 331 F.3d at 521. Therefore, the search's validity "turns on the second prong," namely, whether the parole officers had reasonable grounds to suspect that Windston-Stroud was violating the terms and conditions of his supervision. *Id.* Here, as in *Loney*, a "review of the record reveals that [they] unquestionably did." *Id.*

---

[6] The Sixth Circuit has held that the statute is constitutional. *Sweeney*, 891 F.3d at 236.

13

Applying the terms of the statute to the facts presented, first, it is undisputed that Windston-Stroud was an active parolee on supervision at the time of the searches at issue. (Doc. 23 at PAGEID # 278.) Second, Winston-Stroud does not contest that, in line with the testimony presented, the parole officers who conducted the entry and searches were authorized field officers engaged within the scope of their duties for the State of Ohio's Department of Rehabilitation and Correction – Division of Parole. Third, based on the evidence presented, the Court finds that Windston-Stroud resided at 39 East Norman Avenue, that he had at least implied permission to use or occupy the house at that address, and that the Silver Chrysler was his motor vehicle or he had at least implied permission to use it.[7]

Fourth, regarding whether the parole officers had reasonable grounds to believe that Windston-Stroud was not complying with the terms and conditions of his supervision, the Conditions of Supervision required him to obtain permission from his supervising officer before changing his residence. (Government Exhibit 10 at ¶2.) Windston-Stroud concedes he "indicated that he resided at 39 East Norman Ave, Dayton, Ohio, which was not an approved parole address" and that, "at the very least, there is evidence that [he] violated his parole for not reporting his new residence." (Doc. 28 at PAGEID # 337, 339.) Additionally, Parole Officer Lear testified that Windston-Stround told him he was living at 39 East Norman Avenue, that Windston-Stround admitted that he failed to inform his supervising officer of the change in address, and that the parole office did not have that address on file for Windston-Stround. (Doc. 21 at PAGEID # 197.) Thus, the parole officers had "reasonable grounds to believe that" Windston-Stroud was "not

---

[7] In his briefing, Windston-Stroud appears to confuse the issue of permission, using testimony from a parole officer to support his assertion that he "was never given permission to use the 39 E. Norman Ave. address." (Doc. 23 at PAGEID # 281.) The text of the statute and of paragraph 7 in the Conditions of Supervision makes it clear that the "permission" referenced in them does not refer to permission of a supervising or parole officer.

14

complying with the terms and conditions of" his post-release control.  O.R.C. § 2967.131(C); *Loney*, 331 F.3d at 521.  In summary, the facts satisfied the statute at issue.  *Id.*

Therefore, the Court disagrees with Windston-Stroud's arguments that the entries and searches of the residence and Silver Chrysler ran afoul of his Fourth Amendment rights.

### III. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion to Suppress (Doc. 14).

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, May 15, 2020.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE